(C. D. 118)

Swift & Co. *v.* United States

United States Customs Court, Third Division

(Decided March 8, 1939)

*Curtis E. Loehle* for the plaintiffs.

*Charles D. Lawrence,* Acting Assistant Attorney General (*Daniel I. Auster, Richard H. Welsh,* and *Richard F. Weeks,* special attorneys), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is a suit against the United States wherein the plaintiffs seek to recover certain moneys claimed to have been unlawfully exacted by the collector of customs at the port of Baltimore on an importation of merchandise designated and agreed to have been oleo stearine. The shipment originated in Australia. The tax was assessed under the provisions of section 701 of the Revenue Act of 1936, amending section 601 (c) (8) of the Revenue Act of 1932, as amended, the rate collected being 3 cents per pound. The importer asserts that the merchandise is not dutiable under the revenue act, but that the only duty assessable is that under paragraph 701 of the Tariff Act of 1930, which he does not contest.

Section 701 of the Revenue Act of 1936, *supra,* insofar as pertinent, is as follows:

(8) * * * tallow, * * * any article, merchandise, or combination * * *, 10 per centum or more of the quantity by weight of which consists of, or is derived directly or indirectly from, one or more of the products specified above in this paragraph or in section 602½ of the Revenue Act of 1934, as amended, a tax at the rate or rates per pound equal to that proportion of the rate or rates prescribed in this paragraph or such section 602½ in respect of such product or products which the quantity by weight of the imported article * * * consisting of or derived from such product or products, bears to the total weight of the imported article * * *.

The Commissioner of Customs promulgated an abstract of decisions by the Department published for the information of collectors of

customs and others in T. D. 48876, relating to the dutiable status of oleo stock and oleo stearine. That abstract is as follows:

(2) *Oleo stock*, edible or inedible, having a titer test of 40° C. or over, is classifiable as tallow under paragraph 701 of the Tariff Act of 1930 and section 601 (c) (8) of the Revenue Act of 1932, as amended by section 701 of the Revenue Act of 1936. Oleo oil and oleo stearine derived from such oleo stock or from any other product specified in section 601 (c) (8), as amended, are subject to the appropriate import tax under such section. * * *

The foregoing ruling had been made in a Bureau letter to the collector of customs at San Francisco on February 23, 1937. The instant merchandise was entered February 24, 1937. The appraiser's report as noted on the summary of entered value was made March 23, 1937.

The controversy then turns on the question as to whether or not this merchandise described on the invoice as edible beef oleo stearine shall be held to be dutiable under the provision of section 701 of the Revenue Act of 1936, above set forth, as "merchandise, * * * 10 per centum or more of the quantity by weight of which consists of, or is derived directly or indirectly from," tallow.

The plaintiffs made no effort to prove the method of manufacturing the instant merchandise in the country of its production. They sought to establish their case on the theory that oleo stearine or oleo beef stearine is a standard product manufactured in a standard manner, and offered competent evidence in support of the method of manufacture in this country. No testimony was adduced, however, as above stated, that these standards are maintained in Australia.

The Government made the following objection to the plaintiffs' method of proof:

The Government contends that all this testimony is beside the point, as indicated by the following (R. 16):

Mr. WELSH. I might make further objection: What difference does it make what goes into tallow or how they make it in this country. We are not concerned with that. We are concerned with whether or not this material, as imported, was derived from tallow. Maybe it isn't—I don't know—but certainly what they do out there is no evidence at all as to what was done or how this oleo stearine or tallow in the country of exportation—

In other words, we are concerned with how they make oleo stock or tallow in Australia; not with the process of rendering in the United States. There are two kinds of plants; those which have an oil-house and those which do not. Swift & Company has an oil-house. The method of rendering fat differs in the one kind of plant from the other (R. 17, 18). There is nothing in the record to show how it is done in Australia.

The importer further relies upon the regulations governing meat inspection in the United States as promulgated by the Department of Agriculture November 1, 1922, and particularly to subparagraph (i) of paragraph 2, section 7, of regulation 17, Labeling, found on page 36 thereof, which we quote herewith:

(i) Oil, stearine, or stock obtained from beef or mutton fats rendered at a temperature above 170° F. shall not be designated as "oleo oil," "oleo stearine," or "oleo stock," respectively.

The inference to be drawn from this regulation, if it has any bearing upon the classification of imported merchandise, is that since this merchandise is admittedly "oleo stearine" (defendant's brief) it had not been rendered at a temperature exceeding 170° F. and therefore was not a tallow. There is nothing in the regulation in question, however, that defines tallow, hence it was necessary to the importer's case that he establish the meaning of the word tallow. In our opinion in view of the collector's classification and the presumption which attached thereto, it was incumbent upon the importer to establish by a preponderence of evidence that the imported product was not derived directly or indirectly from tallow, that is, 10 per centum or more thereof. In our judgment he could not meet this burden of proof by evidence which establishes that oleo stearine is obtained from a further processing of oleo stock and that oleo stock is made from beef fat rendered at a temperature of 170° F. according to the process of manufacture in this country. Neither are we impressed with the theory that the regulations of the Department of Agriculture concerning the method of labeling products of beef or mutton fat shall control the customs officials on the classification of such merchandise for duty purposes. A product may be classified under a particular designation of the tariff act and yet be required to have an entirely different label when placed in commerce under food regulations.

Furthermore, terms used in the tariff acts have long been held to have been used with their commonly accepted meanings or definitions. If, as the importer contends, oleo stock signifies a generic commodity from which oleo oil and oleo stearine are produced, then he is out of court because of the common meaning of the terms oleo oil and oleo stearine. Oleo oil is defined in Webster's New International Dictionary, Second Edition, as follows:

A yellow oil of buttery consistency expressed from certain animal fats (esp. the high grade of beef tallow known as *premier jus*), the greater portion of the solid fat (oleo stearin) being left behind. It is used in making oleomargarine.

The same authority defines oleo stearine as—

The solid residue of tallow after removal of oleo oil or tallow oil; beef stearin. Its chief use is in lard substitutes.

In a text entitled "Chemical Technology and Analysis of Oils, Fats, and Waxes," by Dr. J. Lewkowitsch, Fifth Edition, Vol. III, under the description of the production of oleomargarine (p. 26), is set forth the method of removing, washing, cooling, hardening, and rendering the fats, after which they are introduced into melting kettles and brought to a temperature not exceeding 42° C., which tempera-

ture is maintained by hot water or steam passing through the jacketed melting kettles. After this, the author continues:

At this temperature a portion only of the tallow contained in the tissue separates on the top of the comminuted rough fat. * * * This melted portion, appropriately termed "premier jus," is run off into shallow tin-lined trays in a cooled room, when the bulk of the "stearine" separates out in a crystalline condition.

The work then describes the reheating of the "premier jus" and the passing of the same through presses, after which it is stated:

The olemargarine, "oleo oil," which runs out from the presses, forms the chief raw material for the manufacture of margarine.

In Vol. II of the same work, at page 756, after describing the melting of the fat at a low temperature not exceeding 50° C., the author states the "premier jus" is obtained. And further,

The production of "premier jus" and the further working up of the same into "beef stearine" (or "mutton stearine") and oleomargarine, "oleo oil," is carried out on practically the same lines as described under the heading "Lard."

By reference to the tariff history of tallow we find in the Summary of Tariff Information, 1920, at page 793, that Congress was given the following information as to the description and uses of tallow:

The term "tallow" includes the fats from sheep and cattle, but the larger part of the tallow produced here comes from the fat of cattle, averaging 50 pounds from a steer and 1 pound from a sheep or goat. There are two classes, edible and inedible. The edible fats of beef are handled much the same as hog fats. Oleo stock is merely a high grade of edible beef tallow, used in making *oleo oil* and *stearin.* Oleo oil is used in the manufacture of margarines and is also heavily exported, especially to Holland. Edible tallows are also used in making sausage, suet puddings, mincemeat, and similar products. The inedible tallows are used in soap, leather dressings, greases, and in the technical industries.

It will be observed that this information classifies oleo stearine as a high grade of edible beef tallow used in making oleo oil and oleo stearine.

It is noted also that the merchandise in suit is described as tallow in the certificate of the Department of Commerce of Australia, attached to the papers in this case.

Since all the sources of information, common, scientific, and legislative, clearly indicate that Congress in making the various tariff provisions involved must have understood that oleo stearine is a derivative of tallow, it therefore follows that the instruction of the Commissioner of Customs to collectors in T. D. 48876, *supra,* is in accordance with the intention of Congress, and that oleo stearine is properly classified as a derivative of tallow under section 701 of the Revenue Act of 1936, *supra.*

We deem it unnecessary, therefore, to enter into a discussion of the evidence on the question of commercial designation, especially as that is based upon statements as to an article produced in this country

and no competent testimony was adduced as to the method of producing the imported article in Australia.

For the reasons set forth above we overrule plaintiffs' claim and hold that the merchandise is properly dutiable as assessed.

Judgment will be rendered accordingly. It is so ordered.